HARRIS, Presiding Judge.
Appellant was indicted by the Grand Jury of Mobile County on separate indictments charging him with the rape of two girls on the same night and at the same place. The cases were consolidated for trial and on appeal. Prior to arraignment he was found to be indigent and the court appointed counsel to represent him. At arraignment, in the presence of appointed counsel, he waived the reading of the indictments, and pleaded not guilty. The jury returned separate verdicts finding appellant guilty as charged in the indictments and he was separately sentenced to twelve years in the penitentiary. The trial judge specifically ordered that the sentences were to run consecutively. After sentences were imposed appellant gave notice of appeal and was furnished a free transcript. Trial counsel was appointed to represent appellant on this appeal.
At the conclusion of the State’s evidence appellant made a motion to exclude the evidence on the ground that the State failed to make out a prima facie case against appellant. This motion raised the sufficiency of the evidence. Appellant filed a written request for the affirmative charge as to each victim of the alleged rapes. The sufficiency of the evidence was also raised in a motion for a new trial.
The evidence presented by the State and on behalf of appellant was in sharp conflict and only a jury could unravel the extremely conflicting evidence and arrive at a verdict.
*1133 For the purposes of this opinion the victims will be referred to as Kim and Jean. Kim testified that she was eighteen years of age and lived with her parents in Grand Bay, in Mobile County, Alabama. Her parents were engaged in a farming operation and she worked on the farm when she was needed. She had known Jean for. about four years. They were in high school together. On the seventh day of May, 1979, they were out together in Jean’s automobile to celebrate Kim’s birthday. They went to a shopping center first and then to a steak house to eat. They had planned to go to a movie after leaving the steak house but the time was 9:30 p. m. and it was too late to see a movie. Jean suggested that they go to a local bar and dance for a while and Kim agreed. Jean suggested the Fireside Lounge in downtown Mobile and they arrived at this lounge around 10:30 that night. Kim had heard this was a “gay” bar but she had not been there before this occasion. They got a table and talked for a while. They did not drink alcoholic beverages in any form or fashion but danced several times. A “gay” young woman came to their table and asked if she could sit with them and they agreed. This woman was named Rose and she was drinking beer and asking other patrons to buy her beer. It was getting late and Kim and Jean decided it was time for them to go home. They got up to leave and Rose, though uninvited, followed them out the front door of the lounge to the parking lot where Jean had parked her car. When they got to the car Jean walked to the passenger’s side to unlock the door for Kim.
Three men were standing around the car parked next to Jean’s. They turned out to be appellant, Ray Pugh and Paul Harrison. Suddenly and without warning these men grabbed Kim and Jean and forced them into the back seat of another automobile. The girl named Rose knew appellant and she voluntarily got in the back seat of the car with appellant and the other girls. Ray Pugh and Paul Harrison got in the front seat. The car belonged to Paul Harrison’s father and Paul drove the car. They drove around for a long period of time and finally the motor, either accidentally or by design, went dead and the men opened the car door and let Rose out. Then Paul cranked the motor and drove off leaving Rose on the roadway. Kim and Jean protested and told the men to turn around and pick up Rose. The men responded by saying they were just playing a joke on Rose and they would return and get her in a few minutes. Paul drove the car out into the country and stopped in a woody and secluded spot.
Kim and Jean got out of the car and tried to stay close to each other waiting for an opportunity to run. They were restrained by the men from running and were told to calm down, that everything would be all right, that this had happened before, and all they had to do was calm down. According to Kim appellant kept hitting Jean in the face and then pushed her into the bushes. One of the other men had Kim by the neck and shoulders and pulled her further away from the place where appellant had Jean in the bushes. He kept telling her to calm down and not make appellant mad. Kim testified that the man holding her pushed her down, removed her panty hose and had sexual intercourse with her against her will; that after he finished appellant then came to her and forced her to have sexual intercourse with him against her will.
After the crime was committed they forced Kim and Jean back into the car and started driving in a wild and reckless manner. She stated that during this ride appellant put a knife to her throat and said, “You don’t think we can let you go now, do you?” and the men just all laughed. Finally, appellant and the other two men released Kim and Jean on a dirt road near a church. They walked about a block from the church to a residence and banged frantically until a man opened the door. The man was named L. B. Loper. They asked him to call them a cab to take them back to town. The time was around 3:00 a. m. and Mr. Loper told them they could not get a cab that early in the morning and he called the Sheriff’s Department. When the officers arrived the girls told them they had been raped and they were taken to the *1134 University of South Alabama Medical Center and were examined by a physician. The officers took the girls back to the scene of the rape where they recovered Jean’s broken glasses and Kim’s panty hose.
On cross-examination Kim testified that it was Jean’s idea to go to the Fireside Lounge and although she had never been there before she knew it was a gay bar. She stated that they arrived at the bar at about 10:30 on the night of May 7, 1979, and that neither had any alcoholic drinks; that she had a coke and Jean drank only water. They danced several times and after a while a girl named Rose invited herself to join them at their table; that Rose was drinking beer and trying to get people to buy her beer. After about an hour and a half Kim and Jean decided to leave and Rose got up to leave with them.
Kim further testified that she did not see appellant until they walked out to get in Jean’s car and did not see his face clearly until she was forced into the other car. This other car was an old blue Nova. Appellant and the three girls were in the back seat and the other two men were in the front seat. The car stalled and Rose got out to fix it and the men drove away leaving Rose.
After they arrived at the dump everyone got out and appellant repeatedly struck Jean in the face. One of the other men forced Kim on the ground and pinned her shoulders to the ground. He then removed her underclothes and raped her.
Jean testified that she was twenty-one years of age and was a college student in Troy, Alabama. On May 7, 1979, she and Kim went to the Fireside Lounge in Mobile after eating supper at a steak house. Jean had been going to the Fireside for about a year and a half and she knew it was known as a gay bar. She and Kim danced for several hours and they met a girl who called herself “Little Rose.” When they left the lounge Jean was grabbed from behind and pulled into a car. In her words: “I went to unlock the car and there was a scuffle behind me and before I could turn around I was grabbed and pulled backwards into the car.” That Kim and Rose were already in the car when she was forced into it. She stated the driver of the car went through the old tunnel and went through an industrial area; that a short time later Rose got out of the car when it stalled. Before Rose got out she heard her say, “Freddie, you know how mad I can get. Don’t pull this_” The car stopped in an isolated area that was woody.
Before she and Kim got out she told Kim to take off her shoes and when she took them off one of the men grabbed them and threw them into the woods. She said she was wanting to run and Kim was wearing heels. She further testified that two of the men held Kim while appellant threw her on the ground and jumped on her and forced her to have sexual intercourse with him; that he slapped her face several times and hit her with his fist real hard; that one of the men kept telling them they might as well give up because they were not the first; that this had happened before and that “we didn’t want to make appellant mad,” because “you don’t know what he could do.” Jean had recently had an operation on her face for an acne condition called “dermabrasion.” The operation was performed by a specialist in skin treatment, and her face was still red and bruised. This was where appellant struck her. After appellant had sexual intercourse with her then one of the other two men did the same thing. When they got ready to leave the rape scene appellant threw Jean’s glasses in the bushes. Jean stated that appellant was the first one to have sexual intercourse with her and she made a positive in-court identification of appellant. After the rapes were completed and while they were riding around appellant held a knife to Kim’s throat and Jean could not watch any more because she thought they were going to be killed.
She further testified that after she was raped she found her glasses but appellant took them from her and threw them back in the bushes. She said when they were finally released they went to the nearest house for help. She banged on the door and a *1135 gentleman came to the door and let them in the house. Mr. Loper lived there and he called the Sheriff’s Department and when the Sheriff’s Department came to the house they carried the girls to the South Alabama Medical Center where they were examined by a doctor.
On cross-examination Jean testified that she thought it was a joke at first when she was pulled into the car because Rose kept calling the men by their names. She admitted that she had used marijuana once or twice a week for approximately a year and a half. She stated she had never been to the Fireside Lounge with Kim before that night and that it was her idea that they go and dance a while before going home. She further testified that she had never met or seen Rose before the night of May 7, 1979; that before Rose was put out of the car that night she was cursing a lot.
Jean further testified that appellant kept throwing her around until she just couldn’t fight it any more; that he pulled on her clothes and tried to pull them off but he did not tear them; that he took her pants off and had sexual intercourse with her while the other two men were holding Kim about five feet away.
Mr. Larry W. Tillman testified that he was a Detective Sergeant with the Mobile County Sheriff’s Department and had been for fourteen years; that he was the Chief Detective in charge of this rape case and that he went to the crime scene with the victims; that it took them about two hours to locate the place and the place was located in the County of Mobile, Alabama; that he searched the scene and found a pair of panty hose and a pair of prescription glasses which were identified by the victims. These items were introduced into evidence after defense counsel waived the chain of custody on these two items of evidence. This witness was asked if the victims picked out appellant from a photographic array and defense counsel stated, “There is no problem with the identification of the defendant.”
The next witness called by the State was Ms. Fay Wainwright. She stated she was a Deputy Sheriff with the Mobile Sheriff’s Department for twenty-one years and that she investigated all rape cases. In the early morning hours of May 8, 1979, she interviewed the rape victims at the University of South Alabama Medical Center. She stated they were very upset and distressed, very angry at what happened to them.
State’s Exhibit 2 was a written document and was read to the Court and jury. We will continue to refer to the rape victims as Kim and Jean: “Stipulation: It is hereby stipulated between the parties that the following would be the testimony of Doctor Brockway who examined Jean and Kim at the USA Medical Center on May 9,1979, at 4:35 a. m. The testimony of Doctor Brock-way. This is to the regard of the physical condition. Jean — small tender area on side of neck, one breast has red tender area, one arm is tender. No visible bruises. Both cheeks are deeply abraded and red. This is the result of a recent surgical procedure for the treatment of acne called dermabrasion. The vagina showed redness and one or two blood blisters. Ten to twenty sperm were found, three or four were alive. Kim — a red mark on neck, it appears to be a suck mark — no visible bruises. Vagina, no lacerations or tears. Two spots of blood, no active bleeding. Some sperm found, some of which were alive. Demeanor, they were not calm but neither were they hysterical. They appeared upset and somewhat angry. The condition of the girls’ vaginas could have been caused by rape but just as equally could have been caused by many other things, including vaginis, a fall where the vagina is struck by an object, tight blue jeans, prolonged bicycle riding, etc. He has seen many rape victims and often as not the vagina is not torn or lacerated. On the whole examination he is unable to state conclusively whether or not a rape occurred, although recent sexual intercourse is certain. It is impossible to determine if the red areas and tender areas are the result of blows or what. It may or may not be indicative to forcible rape.”
With this stipulation the State rested its case against appellant and his counsel made *1136 a motion to exclude on the grounds the State had not made out a prima facie case. The motion was denied and appellant called his first witness, J. B. Loper.
Mr. Loper testified that he lived on Route 2, Wilmer, Alabama, and around 3:30 on the morning of May 8, 1979, two young ladies came to his house. He was awakened by the ringing of the door bell and loud pounding on the front door. He let the ladies inside his house and they asked him to call a cab to take them to their car parked on Conti Street in Mobile. He told them he doubted if they could get a cab at that hour of the morning and suggested that the Sheriff’s Department should be called. Mr. Loper called the Sheriff’s Office. The girls appeared to be scared, quiet, upset and angry. They told him they had been put out of a car. After the Sheriff’s Department arrived they questioned the girls for over an hour. He was in another room and he heard the girls tell the officers they had been raped, and this statement was made about five minutes after the officers arrived.
On cross-examination he stated that the clothes of one of the girls appeared to be messed up and she excused herself to go to the bathroom to straighten her clothes. The girls went to the window and looked out several times and said they were afraid “they” might come back.
Ms. Rosalee Andrews, better known as “Little Rose,” was called as a witness for the defense. She stated she lived at 915, Highway 43, Saraland, Alabama, but had been employed in Tuscaloosa for a period of four months prior to this trial. She testified she met Kim and Jean in the Fireside Lounge on the night of May 7, 1979. She claimed she went to the table where the girls were sitting and they invited her to sit with them. She was drinking beer. While they were sitting at the table appellant came in and ordered three beers to go. After getting the beer he started to leave and saw her and came to the table and said, “Rose, would you like to go outside and smoke a joint?” Rose said “yes” and she left, followed by Kim and Jean who asked Rose if appellant minded their coming. Appellant said he did not care. They got in the car and started driving around with the three girls and appellant in the back seat and two men in the front seat. They drove for about forty-five minutes and no marijuana was produced and Rose asked to be taken back to the Fireside. The car stalled and Rose got out, raised the hood and shook the battery cables. The car was cranked and the car was driven away, leaving Rose.
Rose stated that both of the girls were drinking alcoholic beverages while they were at the Fireside. She said no one was forced into the car and they did not request to leave the car or be taken anywhere.
On cross-examination Rose testified that she and appellant had been friends for several years and that she came from Tuscaloosa to testify in his behalf. She and appellant had smoked marijuana together before and had also drunk alcoholic beverages together. She was not subpoenaed and was not paid her expenses. She voluntarily came to court to help appellant. She stated she did not know what happened after she was abandoned on the road that night. She freely admitted that she was “gay."
Appellant testified that he was divorced, 25 years of age, lived with his parents at 317 South Baldwin Street, Mobile, Alabama, and worked for his in-laws as a carpenter; that five years previously he pleaded guilty to the sale of one pound of marijuana and received a two-year sentence, served eight months and made parole.
From the record:
“Q. And made parole, all right. Now, since the time you made parole, have you ever been convicted of any other crime?
“A. No, sir, I haven’t.
“Q. Have you been in any trouble other than this particular incident right here?
“A. No, sir.”
He stated he was with two friends on the night of May 7, 1979, Ray Pugh and Paul Harrison, and they were just riding around drinking beer; they chipped in and bought a case of beer and he drank six or seven *1137 bottles while it was still cold. When the beer got hot he told his companions to stop at the Fireside Lounge and he would pick up three bottles of cold beer. Appellant bought three beers and as he started to leave he saw Rose whom he had known since high school. He had never dated her and never really hung around with her but had seen her on different occasions. They had been good friends in high school and since. He went to the table where Rose was sitting and asked her if she wanted to go outside and smoke a joint and she said, “yeah.” That Rose, Kim and Jean followed him and his friends out of the lounge.
Appellant stated that everyone got in the car and they left to buy some marijuana. They could not find any marijuana and appellant said he had some at his house and Paul Harrison drove the car to appellant’s home and he soon returned to the car and announced he couldn’t find his marijuana and said he must have smoked it. They continued to drive around and the car stopped and appellant and his companions got out to go to the bathroom. While they were outside Ray or Paul said, “Well, look now, I know this Rose girl. You know she is nothing but a dike (sic). We don’t want her in the car. We want to try to be with these girls.” The three men got back in the car and drove until they came to a stop sign and the motor went dead. Rose got out and fixed it and they drove off and left her in the road. They stopped in an alley and everyone got out and appellant and Jean started “making out.” Jean did not try to get away but said it was time to go home. The men discussed the situation and Paul said that unless the girls made love to them they were not going to take them home. Appellant stated the girls were angry but they said, “If we make love with y’all, are y’all going to take us back to our car?” Ray or Paul said, “All right.”
Appellant further stated that Paul and Kim walked down the path away from him and Jean; that Kim did not resist or protest and that he and Jean went to a grassy area when Jean removed her underclothes and they had sexual intercourse. Then they dressed and returned to the car. Appellant said he did not have intercourse with Kim but Paul Harrison did have sexual intercourse with Jean. They all got back in the car and left; that no one held a knife to the girls’ throats and he never saw a knife; that after driving for a while Paul stopped the car and ordered the girls to get out and they complied with that order. Appellant denied slapping, striking or hitting Jean and he denied forcing either one of the girls to have sex with him that night.
On cross-examination appellant admitted that he had been in trouble since he was convicted for selling marijuana, but “not serious trouble.” He admitted confessing to the crime of fraudulent use of a credit card, having been convicted of D.W.I., and serving three months in jail. Finally, appellant stated that he went along with Paul when Paul said they would not take the girls home unless the girls had sex with them. Appellant stated, “They didn’t say they didn’t want to have sex. They said that all they wanted us to do was to take us (sic) home, they didn’t want no part of us any more.”
Appellant contends that reversible error was committed by the trial court in restricting his voir dire examination of the venire. Counsel stated:
“Ladies and gentlemen of the jury, the charges against this young man are rape, probably one of the more heinous of crimes that a person can commit. At this stage there are charges. All it is is an acquisition (sic). To prove that charge testimony is going to be taken from the stand. By the nature of the charge some of the testimony is going to be rather unpleasant. You normal, sociable people don’t normally talk about such things in their conversations, especially between members of the opposite sex. If anyone here would be offended or feel like they would be offended and rather not — just rather serve on a jury involving a rape case, I would ask that you stand and identify yourself.”
At this point the trial judge stated: “All right, you don’t have to answer that ques *1138 tion, ladies and gentlemen,” whereupon appellant’s counsel noted an exception.
It is settled by the case law of this state that the extent and scope of voir dire examination of prospective jurors are within the sound discretion of the trial court. Much must be left to the sound discretion of the trial court as to the nature, variety, and extent of the questions that should be asked prospective jurors by the parties or their counsel in the process of selecting the jury to try the case. Peoples v. State, Ala.Cr.App., 375 So.2d 561; Radford v. State, Ala.Cr.App., 348 So.2d 880; Slinker v. State, Ala.Cr.App., 344 So.2d 1264.
Most, if not all, of the old cases cited Title 30, Section 52, 1940 Code of Alabama, which provided:
“In civil and criminal cases, either party shall have the right to examine jurors as to their qualifications, interest, or bias that would affect the trial of the case, and shall have the right, under the direction of the court, to examine said jurors as to any matter that might tend to affect their verdict.”
In Clark v. State, 294 Ala. 493, 318 So.2d 822, the Supreme Court said:
“This Court has on occasion said that ‘the clear purpose of the statute is to limit the inquiry to matters that might probably bias the jurors in considering and determining the case ... Nevertheless, there are many cases in which this court has said that the right given by the statute allows a ‘liberal’ inquiry; ... a ‘wide latitude,’ and that ‘the right of inquiry under the statute is a broad right just so it is not exercised in bad faith or merely designed to prejudice the case.’ ”
The Court in Clark, supra, went on to hold that under this section the right to question jurors remains within the sound discretion of the trial court.
In Peoples v. State, supra, Judge Leigh M. Clark, in his usual masterful and illuminating style of writing opinions for this court, stated:
“It appears that there is now no statutory authority that replaces the quoted section of the 1923 Code and the 1940 Code as it expressly pertained to ‘criminal’ as well as ‘civil’ cases. As to trials in civil cases, the mentioned section of the 1923 Code and the 1940 Code, respectively, is largely superseded, but somewhat qualified, by Rule 47(a) of Alabama Rules of Civil Procedure.
“We do not attempt to explain the reason for the absence at this time of statutory authority on the subject of the sections mentioned of the previous Codes pertaining to the right of parties in criminal cases to examine prospective jurors for information that would tend to aid the parties in the process of selecting the jury to try the case. However, in noting this absence of the former codal provision, we do not think that a different decision from that which we now make would be appropriate even if the content of the sections of the previous Codes as quoted above were in the 1975 Code.
“In considering the quoted section of the Code then applicable, it was stated in Rose v. Magro, 220 Ala. 120, 124 So. 296, 299 (1929):
“ ‘... The statute (section 8662, Code) was not intended to take away the discretion of the trial court in such a matter.’ ”
We find no abuse of discretion by the trial court in instructing the jury not to answer the question posed by appellant’s counsel on the voir dire examination of the prospective jurors. The mere possibility that a juror might find testimony in a rape prosecution disquieting and distasteful is not such bias as would affect the verdict of the jury in determining the case.
Appellant contends the trial court erred to a reversal in refusing to give the jury requested charges 8, 9, and 10. These charges are as follows:
“Charge no. 8. The Court charges the jury that if you find from the evidence in this case that the alleged victim is of a bad character then the jury may look to this bad character in determining what credence, if any, you will give to this alleged victim’s testimony.”
*1139 “Charge no. 9. The Court charges the jury that if the evidence convinces you that the alleged victim is a person of bad character, and unworthy of belief, then you may disregard the alleged victim’s testimony altogether.”
“Charge no. 10. The Court charges the jury that if from all the evidence in this case, after you have considered same, you are satisfied that any witness in this case has proven to be of bad character, you may look to that fact in saying how much weight you will give to the testimony of such witness.”
We note at the outset that there is absolutely no testimony that the rape victims were persons of bad character or that they had a bad reputation in the community. The refused charges are abstract and misleading and for that reason were properly refused.
The refused charges were apparently grounded on the fact that one of the rape victims admitted that she smoked marijuana once or twice a week for a year and a half. The other rape victim stated that she had tried to smoke marijuana only once.
Courts are not blind to what others know. We judicially know that in recent years the use of marijuana has become prevalent and is easily obtainable throughout the country. It is illegal to possess this drug for any purpose. It is condemned by statute.
We cannot brand a person one of “bad character” simply because that person smokes marijuana on occasions but we do not condone even the personal use of marijuana on a casual basis or on any basis. In our opinion the trial court did not err in refusing to give the requested charges set out above.
The victims in the instant case signed statements relating the facts which gave rise to this prosecution. Counsel for appellant contends that he was entitled to read and inspect such statements. These statements were not used by the victims to refresh their recollections while they were on the witness stand. The trial court correctly ruled that defense counsel was not entitled to inspect and use the statements. Cooks v. State, 50 Ala.App. 49, 276 So.2d 634, certiorari denied, 290 Ala. 363, 276 So.2d 640; Slinker v. State, Ala.Cr.App., 344 So.2d 1264.
Finally, appellant complains that it was error to allow the State to question him about other crimes when appellant testified on direct examination that he had not been in any other trouble since he was convicted on a charge of selling marijuana for which he was sentenced to two years in the penitentiary.
On cross-examination appellant was asked if he had been convicted for D.W.I. and had confessed to the fraudulent use of a credit card. Over objection he was allowed to testify that he served three months in the County Jail on the D.W.I. conviction and the credit card case was still pending against him although he had confessed to this offense.
In Leonard v. State, Ala.Cr.App., 369 So.2d 873, writ denied, Ala., 369 So.2d 877, this court held:
“Of course, it is a general principle that, where a matter has been gone into by one party to a cause, the other party has a right to explain away anything, if he can, that may have been brought out to his detriment.”
When appellant testified on direct examination that he had not been in any other trouble since his marijuana conviction he “opened the door” for the State to adduce evidence that his testimony was untrue.
Where the evidence raises questions of fact for the jury, and such evidence, if believed, is sufficient to sustain the conviction, the denial of a motion to exclude the State’s evidence, refusal to give the affirmative charge and overruling motion for a new trial, do not constitute error. Young v. State, 283 Ala. 676, 220 So.2d 843.
We have carefully searched the record for errors injuriously affecting the substantial *1140 rights of appellant and have found none. The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur.